UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FREEDOM MORTGAGE CORPORATION,

     Plaintiff,

v.

                                               Case No. 26-cv-
                                               Hon.

BRIAN SWEET,

     Defendant.

_____/

Alex L. Alexopoulos (P40547)
Law Offices of Alex L. Alexopoulos
609 Gardner Avenue
Clawson, MI 48017
(248) 736-8559
aalexo60@gmail.com

Michael J. Fortunato (to be admitted)
Christopher S. Koller (to be admitted)
Benjamin S. Levine (to be admitted)
Rubin, Fortunato & Harbison, PC
1200 Liberty Ridge Drive, Ste. 220
Wayne, PA 19087
 (610) 408-2005/2020/2057
mfortunato@rubinfortunato.com
ckoller@rubinfortunato.com
blevine@rubinfortunato.com

Attorneys for Plaintiff

_____/

## **VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff, Freedom Mortgage Corporation ("Freedom"), by and through its

undersigned counsel, brings this Verified Complaint against Defendant, Brian Sweet ("Sweet"), for: (i) breach of contract; (ii) breach of fiduciary duty and duty of loyalty; (iii) misappropriation of trade secrets/confidential information under the Defend Trade Secrets Act of 2016 (DTSA), 18 U.S.C. §1836 et seq.; (iv) misappropriation of trade secrets/confidential information under the Florida Uniform Trade Secrets Act, § 688.001 et seq.; (v) misappropriation of trade secrets/confidential information under the Michigan Uniform Trade Secrets Act, MCL § 445.1901 et seq.; (vi) conversion; and (vii) unjust enrichment. Freedom seeks immediate injunctive relief to preserve the *status quo ante* pursuant to Rule 65 of the Federal Rules of Civil Procedure, and in support thereof avers as follows:

## **INTRODUCTION**

1.     For over three decades, Freedom has helped millions of Americans buy and refinance their homes. As one of the nation's top mortgage lenders, Freedom provides a variety of products and services to further and expand homeownership for its customers.

2.     Freedom hired Sweet in June 2025 as a Senior Vice President of Product Management responsible for managing a team of software developers. Freedom uses and is developing software tools that automate the loan process including application, loan document generation, and the loan closing process. In direct violations of his contractual and common law obligations, Sweet—over the

2

course of several months leading up to his resignation, while employed with Freedom, and with access to Freedom's confidential and trade secret information — developed software tools that directly compete with Freedom's products and services. On March 11, 2026, Sweet resigned from Freedom informing the company that he intends to secure more than $1 million in anticipated revenue from selling "his new" software. Sweet specifically said that he was resigning to pursue a "once in a lifetime" opportunity. The problem is that his "opportunity" was built on a foundation of misconduct and at Freedom's expense.

3. Freedom seeks injunctive relief to maintain the *status quo* and to protect its trade secret information pending the outcome in arbitration. Freedom will be filing an arbitration action pursuant to the parties' arbitration agreement, which explicitly permits Freedom to seek preliminary injunctive relief in Court.

## PARTIES

4. Freedom is a national mortgage services company that has offices and employees throughout the United States, including in Michigan. Freedom engages in interstate commerce.

5. Freedom is incorporated under the laws of the state of New Jersey, with a principal place of business at 951 Yamato Road, Suite 175, Boca Raton, Florida 33431.

6. Sweet is an adult individual who lives at 26307 Little Mack Avenue,

Saint Clair Shores, Michigan 48081.

7. Sweet was Freedom's Senior Vice President of Product Management working remotely for Freedom in Metro Detroit.

**<u>JURISDICTION AND VENUE</u>**

8. Subject matter jurisdiction exists by virtue of diversity of citizenship under 28 U.S.C. §1332. Complete diversity exists because Freedom is a citizen of the states of New Jersey (state of incorporation) and Florida (principal place of business), and Sweet is a citizen of Michigan.

9. The matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

10. Jurisdiction is also proper pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1367 because Freedom has asserted a statutory claim for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016, 18 U.S.C. §1836 <u>et seq.</u>, and all other claims are so related to Freedom's trade secrets claim that they form part of the same case or controversy under Article III of the United States Constitution.

11. Although Sweet has an arbitration agreement with Freedom, the arbitration agreement specifically permits Freedom to seek injunctive relief against Sweet in a court of competent jurisdiction to preserve the *status quo ante* pending the outcome in any arbitration.

12. Venue is appropriate in this district as Sweet lives and worked for

Freedom within this district and a substantial part of the events giving rise to this action occurred within this district.

13.    Freedom seeks immediate injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## THE FACTS

14.    As one of the nation's top mortgage lenders, Freedom utilizes technological tools and software to automate the loan process.  Borrower-facing tools include mobile device and web-based applications and portals that customers use to apply for and service their loans.

15.    Mortgage lenders such as Freedom use software and other technological platforms to automate and manage the entire loan application and approval process, including collecting customer documents, underwriting and pricing the loan, preparing loan and closing documents, and managing payments and customer service functions.  These platforms are commonly referred to as a Loan Origination System ("LOS").

16.    A Product and Pricing Engine ("PPE") is one type of LOS software that Freedom and other mortgage lenders use to automate the calculation of loan pricing, eligibility, and interest rate locks.

17.    Document Generation ("DocGen") platforms are another type of LOS software Freedom and other mortgage lenders use to automate the creation of

regulatory compliant, state-specific, loan disclosure and closing packages.

18.    Freedom is affiliated with Archwell Holdings, LLC ("Archwell").  The Archwell family of companies provides essential corporate services, technology, and consulting to the mortgage, finance, and banking industries.

19.    Xpanse, LLC ("Xpanse") is an Archwell affiliate that develops and sells LOS technology and software solutions to drive automation across the financial services industry, including the mortgage industry.

20.    Freedom hired Sweet on June 16, 2025 as a Senior Vice President of Product Management responsible for managing a team of software developers. Sweet had experience in software and application development (i.e., computer coding).  Freedom hired Sweet to lead a team to further develop Freedom's borrower-facing/servicing-side applications, such as the Freedom digital mobile application, Freedom's Authenticated Borrower Portal (where customers complete applications, make payments, etc.), and borrower-facing components of Freedom's website, which are generally referred to as point-of-sale applications.

21.    Xpanse owns a PPE platform named MindBox, which Freedom currently uses as its PPE platform.

22.    Xpanse is developing a new mortgage LOS platform including a PPE and DocGen application that Freedom will use and that Xpanse intends to market and sell to other mortgage lenders.

6

23.     Beginning in January 2026, Freedom provided Sweet with access to confidential and proprietary information concerning its and Xpanse's plans to develop the new LOS platform.  This information included a 25-page PowerPoint detailing the strategic guide for Xpanse's new LOS platform, including PPE and DocGen applications, and including methods to reduce the loan life cycle and to incorporate Artificial Intelligence ("AI") into the development and deployment of the LOS platform.  Freedom also gave Sweet access to a 31-page Business Requirements Document detailing how the company intended to implement product, architecture, engineering, quality assurance, security, and compliance functions in the new LOS.  Additionally, Freedom gave Sweet access to a 7-page document that identified and detailed the specific challenges that a next generation LOS platform would need to address and that was developed by and based on Freedom executives' decades of experience in the industry.

24.     On March 10, 2026, Sweet, while attending meetings in Conshohocken, Pennsylvania, informed Freedom that he intended to resign and that he had created his own software for the mortgage industry that he was in the process of selling to other mortgage companies (i.e., Freedom's competitors) for over $1 million.

25.     On March 11, 2026, Sweet emailed his resignation notice to Freedom requesting that his last day of employment be March 20.

26.     In further discussions, Sweet revealed that he had developed his own

7

LOS software including a DocGen and PPE platform as well as a TikTok/Zillow application that he was in the process of selling to Freedom's competitors. One specific prospect was AB Mortgages, a Freedom competitor. He claimed that he had been working with former coworkers employed at United Wholesale Mortgage, LLC ("UWM"), another Freedom competitor, to develop his competing mortgage services software. He also claimed that he used AI code-generation software to write his LOS platform.[1]

27.     Sweet also disclosed that he had been consulting with BeSmartee Inc. ("BeSmartee"), a company that develops and sells a mortgage point of sale (POS) platform that would directly compete with the POS platform Xpanse was co-developing.    Sweet indicated that he had been assisting BeSmartee in its development of certain customer point-of-sale applications—the same type of applications that Freedom was paying Sweet to develop on its behalf.

28.     Sweet developed his "own" competing PPE platform, consulted with employees of UWM, and marketed "his" PPE platform to Freedom's competitors <u>all while Freedom employed him</u> in clear violation of the conflict of interest provisions of his agreement with Freedom.  Moreover, Sweet's conduct directly violated the terms of his employment with Freedom, including restrictions on competition,

---

[1] AI code-generation software uses artificial intelligence to automatically produce computer code from natural language instructions or partial code snippets.

confidentiality, and Freedom's ownership and intellectual property rights to any software Sweet authored.

29. The confidential and proprietary documents Sweet had access to during his Freedom employment would essentially serve as a blueprint and provide the necessary prompts for use in an AI code-generation software, like Sweet used to develop his LOS platform.

30. Freedom accepted Sweet's voluntary resignation, effective March 20, 2026, and placed him on a paid leave status while immediately terminating his access to Freedom systems and property as of March 11, 2026.

31. On March 13, 2026, Freedom demanded that Sweet return all of Freedom's confidential and proprietary information and comply with his contractual obligations. See March 13, 2026 Correspondence from Michael J. Fortunato, Esq. to Sweet attached hereto as Exhibit "A."

**Sweet's Protective Covenants Agreement and Arbitration Agreement**

32. At the commencement of his employment with Freedom, on June 16, 2025, Sweet executed a *Protective Covenants Agreement* ("PCA"). See PCA attached hereto as Exhibit "B."[2]

33. Section 2 of Sweet's PCA prohibits Sweet from engaging in the

---

[2] Sweet's PCA specifically applies to Freedom and its parents, predecessors, successors, subsidiaries, and affiliates. Affiliates is defined to include Archwell and any affiliates of Archwell. See Exhibit "B" at p.1 and p.1, f.n. 1.

9

following conduct during his employment with Freedom:

> … Employee may not engage in any other work outside of Employee's employment with Freedom, whether full-time or part-time, in any financial services business or that pertains to mortgage lending or any engage in work related to real estate listings, sales, lending transactions, and related real estate activities.

> … Employee will not, without the Company's express written consent, directly or through the direction or control of others, engage in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, their employment by the Company, unless expressly authorized under applicable state law.

See Exhibit "B" at Sections 2.1 and 2.2.

34.     In Section 4.2 of his PCA, Sweet further agreed that during his employment with Freedom and for a period of eighteen (18) months after the last day of his employment:

> Employee will not, directly or through the direction or control of others, for Employee's own benefit or for the benefit of a Competitor [as defined in the PCA] or any other person or entity: (a) contact, call upon or solicit [as defined in the PCA], attempt to contact, call upon or solicit, or assist others in contacting. Soliciting or calling upon, any Covered Customer [as defined in the PCA] for the purpose of: (i) selling or providing a Competing Product or Service [as defined in the PCA] to the Covered Customer; (ii) doing any business with a Covered Customer with respect to a Competing Product or Service; (iii) moving, diverting, converting or taking away the patronage of the Covered Customer to a Competitor; or, to the extent permitted by applicable law; (iv) interfering with an existing or prospective business relationship the Company has or is pursuing with a Covered Customer; or (b) knowingly engage in any other conduct that is intended to cause, or could reasonably be expected to cause, a Covered Customer to stop or reduce doing business with the Company, or that would involve diverting business opportunities away from the Company (collectively,

the "**Customer Non-Solicitation Obligations**"). In addition, during Employee's employment and thereafter, Employee will not use the Company's Trade Secrets to solicit any of the customers or prospective customers of the Company (including individual consumers) for the purpose of diverting or attempting to divert any business away from the Company.

See Id. at Section 4.2.

35.     "Competing Product or Service" is defined to include:

a product, service  or program (in existence or under development) of any person or entity other than the Company that has the same purpose or function as, or competes with or is intended to compete with, a Company product, service or program about which Employee had involvement with or access to Confidential Information, including, without limitation, Trade Secrets, during the Look Back Period or that is so similar in purpose or function to such product, service or program that it would displace or diminish the business opportunities for such Company product, service or program.

See Id. at Section 4.1(b).

36.     "Competitor" is likewise defined to include "any entity or person engaged in the business of developing or providing a Competing Product or Service or is planning or preparing to engage in such a business." Id. at Section 4.1(a).

37.     Sweet also acknowledged the confidential and proprietary nature of the information that he was given access to during his employment at Freedom and promised:

to use Confidential Information [as defined in the PCA] only as necessary in the performance of Employee's duties on behalf of the Company and in a manner compliant with Company policies, and to hold such Confidential Information in confidence and trust, and not to, or permit any other person or entity to, directly or through others,

11

without the prior written consent of the Company: (a) use Confidential Information, including, without limitation, Trade Secrets, for the benefit of any person or entity other than the Company; (b) engage in any unauthorized use, disclosure, dissemination, or reverse engineering of Confidential Information, including, without limitation, Trade Secrets; (c) retain Confidential Information, including, without limitation, Trade Secrets, including any copies existing or stored in any form or manner whatsoever (including paper, electronic or digital form) which are in Employee's possession, custody, or control, except as expressly authorized in writing by the Company; (d) destroy, delete, or alter Confidential Information, including, without limitation, Trade Secrets, without the Company's prior written consent; I remove, copy, duplicate or otherwise reproduce any document or tangible item embodying or pertaining to any of the Confidential Information, including, without limitation, Trade Secrets, except as required to perform responsibilities for and as authorized by the Company; and/or (f) publish, release, disclose, deliver or otherwise make available to any third party any Confidential Information, including, without limitation, Trade Secrets, by any communication, including oral, documentary, electronic or magnetic information transmittal device or media. Nothing in this Agreement shall be construed to permit Employee to retain or recreate any Confidential Information, including, without limitation, Trade Secrets, after Employee's employment with the Company ends. **Employee understands that Confidential Information, including, without limitation, Trade Secrets, has been provided to Employee in confidence, and Employee agrees that the unauthorized use or disclosure of any of the Company's Confidential Information or Trade Secrets obtained by Employee during Employee's employment with the Company constitutes unfair competition.**

See Id. at Section 3.2 (emphasis added).

38.     Freedom expends considerable resources to develop its confidential, proprietary, and trade secret information, including information from its affiliates ("Confidential Information").  Freedom's Confidential Information is key to its success, is its most valuable asset, and provides Freedom with a distinct competitive

advantage.

39.     Freedom's competitors have a significant interest in gaining access to its Confidential Information, and access to its Confidential Information would be very valuable to any competitor of Freedom.

40.     Freedom takes critical measures and incurs significant expense to safeguard its Confidential Information, including, among other things, the following:

   a. Freedom employees are required to execute confidentiality/non-disclosure agreements;

   b. Freedom employees are also required to abide by its Employee Handbook;

   c. Freedom employees are required to receive training regarding the proper use of Confidential Information; and

   d. Freedom spends considerable sums and takes considerable measures to secure its information technology networks, to prevent disclosure of its Confidential Information outside of the company, and to limit access of its Confidential Information to only those employees that require access to it.

41.     In addition, Sweet agreed to a works for hire provision in which he agreed that any inventions, developments, and other works that he authored or

prepared, in whole or part, during his engagement with Freedom belong to Freedom.

Specifically, Section 6 of his PCA provides:

> **INVENTIONS, DEVELOPMENTS AND WORKS.** Employee acknowledges and agrees that all drafts, records, memoranda, notes, compositions, writings, diaries, drawings, photographs, graphics, logos, sketches, audio-visual material, films, pictures, sound recordings, charts, software, algorithms, code, and any other materials (including, but not limited to, any invention that is or contains such material and any in-house built or in-house modified technology, mobile applications, algorithms and software, and all derivatives and updates thereto) authored or prepared by Employee, in whole or in part, or that Employee authors, creates, prepares, in whole or part, during Employee's engagement with the Company and within the scope of their engagement as an employee, but excluding Excluded Works (defined below) ("Work" or "Works"), are deemed works made for hire, owned and authored by the Company, as that term is defined in the Copyright Laws of the United States of America. To the extent that any such Works are deemed not to be works made for hire, subject to the State-Specific Modifications provided for in the Appendix (where they apply), Employee irrevocably and without limit hereby assigns all of Employee's right, title, and interest and all copyright in the Works throughout the world to the Company (or its designee) as set forth above. Employee expressly waives any ownership claim, now or in the future, in the Works; any right or claim of any right to create new derivative works or adaptations based on the Works in the future; any right to prevent the Company from using, selling, distributing, or developing the Works or any part of them; and the right to apply for or file any copyright registrations for the Works or any part of them. Employee acknowledges that the Company has the sole right to apply for, obtain, and own copyright registrations and use the copyright notices to the Works. Employee now and forever expressly waives any right of publicity, attribution, and integrity, including any so-called moral rights or equivalents thereof, arising under United States federal law, any state law, and under the laws of any other country that conveys rights of the same nature. Employee acknowledges and agrees that, other than Excluded Works (defined below), any and all Inventions (defined below), made, conceived, discovered, reduced to practice or developed, by Employee alone or as a result of Employee's work with

14

others, during Employee's engagement with the Company belong to the Company. Additionally, any and all Inventions (defined below), made, conceived, discovered, reduced to practice or developed, by Employee alone or as a result of Employee's work with others, within one (1) year after the termination of Employee's engagement with the Company that are attributable to Employee's previous exposure to Confidential Information and are within the scope of their engagement with the Company, belong to the Company, to the extent permitted by applicable law. Employee will promptly and fully disclose to the Company all such Inventions. To the extent permitted by applicable law, Employee hereby irrevocably transfers and assigns to the Company or its designee (if not otherwise transferred by law), as its exclusive property, the entire worldwide and perpetual right, title and interest in all such Inventions, including (but not limited to) any patent applications, patents, trade secrets, or confidential information. Employee agrees that these obligations bind Employee's assigns, executors, administrators, and other legal representatives. "Invention" or "Inventions" means any and all discoveries, ideas, improvements, innovations, inventions, information, know-how, processes, or techniques, in whole or in part, whether patentable or not, which generally relate to or are useful to Employee's current or future business.

Employee will cooperate fully with the Company, during and after their engagement as an employee for the Company, with respect to the protection of the Company's intellectual property rights in the Works and Inventions anywhere in the world, including signing all papers that the Company requests that Employee sign to perfect or protect those rights (at the Company's expense).

See Id. at Section 6.

42.     Sweet acknowledged and agreed that Florida law shall govern the interpretation and enforcement of the PCA.  See Id. at Section 8.7.  Florida has a substantial relationship to the parties because Freedom maintains its headquarters there.

43.     Sweet acknowledged and agreed that any breach of the agreement

15

would cause irreparable harm to Freedom for which monetary damages would not be an adequate remedy, and therefore, Freedom will be entitled to injunctive relief. See Id. at Section 5.

44.     Sweet's development of competing mortgage software while he was employed at Freedom, and in concert with current employees of UWM, a competitor of Freedom, directly breaches his PCA.

45.     Also, Sweet providing assistance to BeSmartee, a competitor of Freedom and its affiliates, in its development of customer point-of-sale applications while he was employed at Freedom directly breaches his PCA.

46.     Freedom never provided written consent for Sweet to develop competing mortgage software, to sell such software to competitors of Freedom, or to do any work for a competitor of Freedom (such as BeSmartee).

47.     Upon information and belief, Sweet developed the competing mortgage software with the use of, and after obtaining access to, Freedom's Confidential Information concerning similar mortgage software and Freedom's and its affiliates' strategies concerning same.

48.     Freedom never authorized Sweet to utilize its Confidential Information for his own benefit or for the benefit of any other person or entity other than Freedom.

49.     Freedom also executed a *Mutual Agreement to Arbitrate Disputes*

("Arbitration Agreement") on June 16, 2025. A copy of the Arbitration Agreement is attached hereto as Exhibit "C."

50. While the Arbitration Agreement provides that all claims between Freedom and Sweet be brought in arbitration, it also specifically provides that Freedom may "apply to a court of competent jurisdiction for any provision remedy in connection with a claim covered by this Agreement including a temporary restraining order or preliminary injunctive relief…." See Exhibit "C" at Section D. Freedom will be commencing an arbitration as required and set forth in the Arbitration Agreement.

**Sweet's Resignation and Violations of Freedom's Rights**

51. On March 11, 2026, Sweet voluntarily resigned from Freedom, to be effective on March 20, 2026.

52. Sweet informed Freedom that he was resigning because he has "an opportunity that could be once in a lifetime." See a copy of Sweet's resignation letter attached hereto as Exhibit "D."

53. Sweet's "once in a lifetime" opportunity is him selling the competing mortgage services software he developed while an employee of Freedom for $1 million.

54. Specifically, Sweet, using artificial intelligence tools and with the help of UWM employees, created and developed over the course of three months—during

his employment with Freedom—competing mortgage services software.  Namely, PPE and DocGen platforms.

55.    Sweet's creation and development of this competing mortgage services software is a direct violation of his PCA.

56.    Moreover, Sweet informed Freedom that he is selling the software to competitors for $1 million dollars.

57.    Upon information and belief, Sweet used Freedom's Confidential Information to develop the competing mortgage services software.

58.    Sweet also provided consultative advice to BeSmartee concerning its development of certain customer point-of-sale applications—the same type of applications that Freedom was paying Sweet to develop on its behalf.

59.    Sweet's conduct has caused, and will continue to cause, irreparable harm to Freedom as follows:

1.  Loss of Confidential Information;

2.  Reputational harm;

3.  Loss of goodwill; and

4.  Economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

60.    Unless Sweet's conduct is immediately enjoined, Freedom will continue to suffer irreparable harm and incalculable damages, including the potential

loss of customers, its Confidential Information, reputation, and goodwill.

## COUNT I
## BREACH OF CONTRACT

61.     Freedom re-alleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

62.     Sweet willfully entered into the written *Protective Covenants Agreement* ("PCA") on June 16, 2025.

63.     The PCA was supported by good and valid consideration in the form of employment, substantial compensation, and access to Freedom's Confidential Information.

64.     The PCA precludes Sweet during his employment with Freedom from, among other things:

a.  Engaging in any other work outside of his employment with Freedom, whether full-time or part-time, in any financial services business or that pertains to mortgage lending, or work related to real estate listings, sales, lending transactions, or related real estate activities.

b.  Engaging in any employment or business activity that is directly or indirectly competitive with, or would otherwise conflict with, his employment with Freedom.

65.     The PCA also includes a work for hire provision whereby any works

created by Sweet while an employee of Freedom, including but not limited to mortgage services software, belong to Freedom.

66. The PCA is necessary to protect Freedom's legitimate business interests, including the protection of its Confidential Information, goodwill, reputation, customers, and relationships with its employees.

67. Sweet violated his PCA by developing competing mortgage services software and selling it for $1 million and consulting with competitors such as BeSmartee to assist them in developing competing software applications.

68. Freedom performed all of its obligations and conditions precedent under the PCA.

69. By virtue of the foregoing conduct, Sweet has knowingly and willfully breached his agreement with Freedom.

70. The above-described conduct is the direct and proximate cause of immediate and irreparable harm to Freedom.

71. In the PCA, Sweet specifically acknowledged that in the event he breached the agreement, Freedom "shall be entitled to an injunction and/or other equitable relief against the Employee, restraining the Employee from violating or attempting to violate any of said covenants." See PCA (Exhibit "B") at Section 5.

WHEREFORE, Freedom respectfully requests judgment in its favor, and against Sweet, as set forth in its Prayer for Relief.

20

## COUNT II
## BREACH OF FIDUCIARY DUTY/DUTY OF LOYALTY

72.    Freedom re-alleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

73.    Sweet was entrusted with a position of responsibility at Freedom.

74.    Sweet owed fiduciary duties and duties of loyalty to Freedom by virtue of his position of trust with Freedom.

75.    The duties Sweet owed to Freedom included the duty of undivided loyalty and the duty to act with the utmost fidelity, integrity, and honesty at all times, and a duty not to act in concert with any third parties, contrary to the interest of Freedom.

76.    In the scope of his employment, Freedom entrusted Sweet with its Confidential Information, including trade secrets.

77.    Sweet's fiduciary duty continues after the termination of his employment and prohibits him from disclosing or using company Confidential Information.

78.    While still employed by Freedom, Sweet breached his fiduciary duties and duties of loyalty to Freedom by, among other misdeeds, developing a competing mortgage services software to be sold for his personal financial gain and consulting with competitors such as BeSmartee to assist them in developing competing software applications.

21

79.     At all relevant times and by virtue of his role with Freedom, Sweet knew or should have known that this unfair and unlawful practice would result in significant injury to Freedom.

80.     The above-described conduct of Sweet is the direct and proximate cause of immediate and irreparable harm to Freedom.

81.     Sweet will continue to cause Freedom irreparable harm if not enjoined.

WHEREFORE, Freedom respectfully requests judgment in its favor, and against Sweet, as set forth in its Prayer for Relief.

## COUNT III
### MISAPPROPRIATION OF TRADE SECRETS AND/OR CONFIDENTIAL BUSINESS INFORMATION UNDER THE DEFEND TRADE SECRETS ACT OF 2016

82.     Freedom re-alleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

83.     Freedom considers its Confidential Information to be proprietary, and it has taken reasonable steps to maintain the secrecy of this information.

84.     Freedom's Confidential Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  It has actual and/or potential independent value because, for example, this information is not generally known to Freedom's competitors, who could obtain economic value from its use or disclosure.

22

Nor was or is such information readily ascertainable to such companies/persons by proper means.  Freedom invested substantial resources to create, develop, compile, and maintain this information.

85.    Freedom's Confidential Information is deserving of trade secret protection.

86.    Specifically, information concerning Freedom and its affiliates' development of mortgage services software, including software related to PPE and mortgage document generation, none of which is in the public domain are trade secrets of Freedom subject to protection under the Defend Trade Secrets Act ("DTSA").  See 18 U.S.C. § 1836 et seq.

87.    This information derives independent economic value by not being accessible, through proper means, to competitors, which can profit from its use or disclosure.

88.    Upon information and belief, Sweet used and/or has in his possession proprietary and confidential information belonging to Freedom, including but not limited to critical information and strategies concerning the development of mortgage services software related to PPE and DocGen.

89.    Upon information and belief, Sweet used and/or relied on Freedom's Confidential Information to develop competing mortgage services software to sell to competitors and consulting with competitors such as BeSmartee to assist them in

developing competing software applications.

90.     Sweet obtained Freedom's Confidential Information by improper means and/or under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secrets.

91.     As a result of Sweet's misappropriation and use of Freedom's Confidential Information, Sweet has violated the DTSA.

92.     The foregoing conduct of Sweet constitutes a willful and malicious misappropriation and misuse of Freedom's Confidential Information.

93.     Under the DTSA, the Court may enter an injunction to prevent any actual or threatened misappropriation of a trade secret.

WHEREFORE, Freedom respectfully requests judgment in its favor, and against Sweet, as set forth in its Prayer for Relief.

## COUNT IV
### MISAPPROPRIATION OF TRADE SECRETS AND/OR CONFIDENTIAL BUSINESS INFORMATION UNDER THE FLORIDA UNIFORM TRADE SECRETS ACT

94.     Freedom re-alleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

95.     Freedom considers its Confidential Information to be proprietary, and it has taken reasonable steps to maintain the secrecy of this information.

96.     Freedom's Confidential Information derives independent economic value, actual or potential, from not being generally known to, and not being readily

24

ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  It has actual and/or potential independent value because, for example, this information is not generally known to Freedom's competitors, who could obtain economic value from its use or disclosure. Nor was or is such information readily ascertainable to such companies/persons by proper means.  Freedom invested substantial resources to create, develop, compile, and maintain this information.

97.     Freedom's Confidential Information is deserving of trade secret protection.

98.     Specifically, information concerning Freedom's and its affiliates' development of mortgage services software, including software related to PPE and mortgage document generation, none of which is in the public domain are trade secrets of Freedom subject to protection under the Florida Uniform Trade Secrets Act ("FUTSA").  See § 688.001 et seq.

99.     This information derives independent economic value by not being accessible, through proper means, to competitors, which can profit from its use or disclosure.

100.   Upon information and belief, Sweet used and/or has in his possession proprietary and confidential information belonging to Freedom, including but not limited to critical information and strategies concerning the development of

mortgage services software related to PPE and DocGen.

101. Upon information and belief, Sweet used and/or relied on Freedom's Confidential Information to develop competing mortgage services software to sell to competitors and consulting with competitors such as BeSmartee to assist them in developing competing software applications.

102. Sweet obtained Freedom's Confidential Information by improper means and/or under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secrets.

103. As a result of Sweet's misappropriation and use of Freedom's Confidential Information, Sweet has violated the FUTSA.

104. The foregoing conduct of Sweet constitutes a willful and malicious misappropriation and misuse of Freedom's Confidential Information.

105. Under the FUTSA, the Court may enter an injunction to prevent any actual or threatened misappropriation of a trade secret.

106. WHEREFORE, Freedom respectfully requests judgment in its favor, and against Sweet, as set forth in its Prayer for Relief.

## COUNT V
### MISAPPROPRIATION OF TRADE SECRETS AND/OR CONFIDENTIAL BUSINESS INFORMATION UNDER THE MICHIGAN UNIFORM TRADE SECRETS ACT

107. Freedom re-alleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

26

108.   Freedom considers its Confidential Information to be proprietary, and it has taken reasonable steps to maintain the secrecy of this information.

109.   Freedom's Confidential Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  It has actual and/or potential independent value because, for example, this information is not generally known to Freedom's competitors, who could obtain economic value from its use or disclosure. Nor was or is such information readily ascertainable to such companies/persons by proper means.  Freedom invested substantial resources to create, develop, compile, and maintain this information.

110.   Freedom's Confidential Information is deserving of trade secret protection.

111.   Specifically, information concerning Freedom's and its affiliates' development of mortgage services software, including software related to PPE and mortgage document generation, none of which is in the public domain are trade secrets of Freedom subject to protection under the Michigan Uniform Trade Secrets Act ("MUTSA").  See MCLS§ 445.1901 et seq.

112.   This information derives independent economic value by not being accessible, through proper means, to competitors, which can profit from its use or

27

disclosure.

113. Upon information and belief, Sweet used and/or has in his possession proprietary and confidential information belonging to Freedom, including but not limited to critical information and strategies concerning the development of mortgage services software related to PPE and DocGen.

114. Upon information and belief, Sweet used and/or relied on Freedom's Confidential Information to develop competing mortgage services software to sell to competitors and consulting with competitors such as BeSmartee to assist them in developing competing software applications.

115. Sweet obtained Freedom's Confidential Information by improper means and/or under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secrets.

116. As a result of Sweet's misappropriation and use of Freedom's Confidential Information, Sweet has violated the MUTSA.

117. The foregoing conduct of Sweet constitutes a willful and malicious misappropriation and misuse of Freedom's confidential, trade secret information.

118. Under the MUTSA, the Court may enter an injunction to prevent any actual or threatened misappropriation of a trade secret.

119. WHEREFORE, Freedom respectfully requests judgment in its favor, and against Sweet, as set forth in its Prayer for Relief.

## COUNT VI
## CONVERSION

120.   Freedom re-alleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

121.   During Sweet's employment with Freedom, he developed a competing mortgage services software.

122.   Sweet's PCA states that any works, including but not limited to software, prepared or authored by him during his employment with Freedom is the property of Freedom.

123.   By virtue of the PCA, Freedom owned and had the immediate right to possess the software developed by Sweet during his employment.

124.   After developing the software, Sweet exercised dominion and control over the software in a manner inconsistent with Freedom's ownership rights.

125.   Sweet's conduct constitutes a wrongful assertion of dominion over Freedom's property.

126.   Freedom has demanded return and surrender of the software, and Sweet has refused to return it.

127.   As a direct and proximate result of Sweet's conversion, Freedom has been deprived of its property and has suffered damages.

128.   WHEREFORE, Freedom respectfully requests judgment in its favor, and against Sweet, as set forth in its Prayer for Relief.

## COUNT VII
## UNJUST ENRICHMENT

129.    Freedom re-alleges and incorporates by reference the allegations of the above paragraphs as though fully set forth herein.

130.    Sweet's development of the competing mortgage services software was in violation of his agreement with Freedom.

131.    By developing, retaining, and selling the competing software for $1 million (according to Sweet), and consulting with competitors such as BeSmartee, Sweet received or will receive a significant benefit.

132.    Sweet had knowledge of the benefit and voluntarily accepted and retained it.

133.    Under the circumstances, it would be inequitable for Sweet to retain the benefit without paying Freedom the value of that benefit.

134.    Accordingly, Sweet has been unjustly enriched as a result of his violation of his agreement with Freedom.

WHEREFORE, Freedom respectfully requests judgment in its favor, and against Sweet, as set forth in its Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Freedom, respectfully requests that, due to the ongoing, and clearly unlawful acts of Defendant, Brian Sweet, the Court issue a preliminary injunction, enjoining Sweet, directly or indirectly, and whether alone or

in concert with others, as follows:

a.  Sweet is ORDERED to cease the development, production, creation, preparation, distribution, and sale of any software product he made while employed by Freedom;

b. Sweet is PROHIBITED from violating the terms of his *Protective Covenants Agreement* ("PCA");

c. Sweet is PROHIBITED from using, divulging, furnishing, disclosing, or making accessible any Confidential Information (as defined in the PCA) of Freedom, in any form whether electronic, digital, or print, to any person, firm, corporation or entity, other than for the benefit of Freedom; and

d. Sweet is DIRECTED to immediately return to Freedom all Confidential Information (as defined in the PCA), whether original, copied, duplicated, reproduced, computerized, handwritten, recreated, compiled, or stored in any way whatsoever;

e. Sweet is PROHIBITED from using, marketing, selling, or otherwise distributing any mortgage services software he created or developed while he was employed by Freedom, including but not limited to the LOS software, PPE and DocGen platform;

f. Sweet is PROHIBITED from destroying, erasing, or otherwise making

unavailable for further proceedings in this matter, or in any arbitration proceeding between or among the parties, any of Freedom's Confidential Information and

any records or documents (including data or information maintained in computer files or electronic media storage) in Sweet's possession or control which relate to the software he developed while employed by Freedom; and

g. Any and all such other just and equitable relief as the Court deems appropriate.

Freedom further respectfully requests that the Court issue a judgment:

a. Granting compensatory damages in favor of Freedom and against Sweet;

b. Granting recoupment of the benefits and economic value Sweet derived from the wrongful use of the competing mortgage services software Sweet developed while employed by Freedom;

c. Granting punitive and/or exemplary damages against Sweet to punish and deter similar conduct;

d. Granting Freedom the reasonable attorney's fees and costs it has incurred in this matter; and

e. Such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

 /s/ Alex L. Alexopoulos
Alex L. Alexopoulos (P40547)
Law Offices of Alex L. Alexopoulos
609 Gardner Avenue
Clawson, MI 48017
(248) 736-8559
aalexo60@gmail.com

Michael J. Fortunato (to be admitted)
Christopher S. Koller (to be admitted)
Benjamin S. Levine (to be admitted)
Rubin, Fortunato & Harbison, PC
1200 Liberty Ridge Drive, Ste. 220
Wayne, PA 19087
(610) 408-2005/2020/2028
mfortunato@rubinfortunato.com
ckoller@rubinfortunato.com
blevine@rubinfortunato.com

Attorneys for Plaintiff

Dated: June 18, 2026


**VERIFICATION**

I, Travis Rulle, Executive Vice President, Chief Information Officer for Freedom Mortgage Corporation, a corporation and the Plaintiff in the foregoing Verified Complaint, and as an officer authorized to do so, verify that the facts stated in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief, and to the extent based upon information received from others, I believe them to be true and correct. I understand that this Verification is

33

made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn falsification to authorities.

_____
TRAVIS RULLE


## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on June 18, 2026, I electronically filed the foregoing papers with the Clerk of the Court using the Court's ECF system. Notice of this filing will be sent to Defendant, Brian Sweet's, attorneys by both United States Mail and electronic mail as set forth below.  Parties may access this filing through the Court's electronic filing system.

Matthew L. Wikander
Smith Haughey Rice & Roegge
100 Monroe Center ST NW
Grand Rapids, MI 49503
mwikander@shrr.com
*Attorney for Defendant, Brian Sweet*


/s/ Alex L. Alexopoulos